**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| ANNA M. NEWBAUER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:14-CV-3548-BH |
| | § | |
| CAROLYN COLVIN, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of transfer dated January 6, 2015, this case has been transferred for all further proceedings and entry of judgment.  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED in part** and **REVERSED in part,** and the case is **REMANDED** for reconsideration.

## I.   BACKGROUND

### A.   Procedural History

Anna M. Newbauer (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act.  On December 12, 2011, Plaintiff applied for DIB, alleging disability beginning on April 20, 2011, due to insomnia, a torn meniscus of the right knee, depression, anxiety, and a hernia. (R. at 124, 147, 173.)  Her application was denied initially and upon reconsideration.  (R. at 73-76, 79-81.)  She timely requested a hearing before an Administrative Law Judge (ALJ), and she personally appeared and testified at a hearing on January 9, 2013.  (R. at 82, 36-67.)  On April 8, 2013, the ALJ issued his  decision finding Plaintiff not disabled.  (R. at

19-28.)  The Appeals Council denied her request for review on May 21, 2014, making the ALJ's decision the final decision of the Commissioner.  (R. at 6-8.)  She timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  (*See* R. at 1; doc. 1.)

**B.    Factual History**

**1.    Age, Education, and Work Experience**

Plaintiff was born on October 30, 1968, and she was 44 years old at the time of the hearing before the ALJ.  (R. at 40, 124, 147.)  She got her GED and has past relevant work as a lead worker or video sales associate.  (R. at 62.)

**2.    Medical, Psychological and Psychiatric Evidence**

On December 3, 2010, Plaintiff presented to HCA Green Oaks hospital with complaints of depression with suicidal ideation over the past couple of days.  (R. at 473.)  She reported that she was unable to work, anxious, had no energy, and felt hopeless.  (*Id.*)  A review of her symptoms was negative.  (*Id.*)  She was admitted to the day hospital program and was involved in psychotherapy, recreational therapy, and general milieu activities.  (*Id.*)  She was also prescribed Lexapro.  (*Id.*)  Plaintiff was diagnosed with "major depressive disorder, recurrent, severe without psychotic features," and she was assessed a Global Assessment of Functioning (GAF) of 40.  (*Id.*)  She was only there for one day, however, when her husband informed the hospital that she had been admitted as an inpatient to another facility.  (*Id.*)  The hospital administratively discharged her on December 10, 2010.  (*Id.*)

On December 5, 2010, Plaintiff presented to Hickory Trail Hospital due to an increased mood depression that included "suicidality."  (R. at 235.)  She identified increased levels of anxiety, sleep disturbance, and impairments in concentration.  (*Id.*)  Her reported stressor was the psychotic

2

breakdown of her sister who was caring for their demented mother.  (*Id.*)  She claimed to have taken excessive Lexapro, causing emergency room intervention.  (*Id.*)  She thought she was going crazy and had lost approximately 20 pounds in the past several weeks.  (*Id.*)  Upon discharge on December 15, 2010, she had improved, her memories for recent and remote events were essentially intact, and she denied overt delusions, hallucinations, and suicidal or homicidal thoughts.  (*Id.*)

Throughout 2011, Plaintiff saw Dr. Bagyalakshmi Arumugham, M.D., a psychiatrist, for treatment for her depression. (R. at 416-433.)

On February 8, 2011, Plaintiff injured her right knee at work while walking down stairs carrying boxes.  (R. at 366, 368.)  On February 25, 2011, she underwent an x-ray of her knee, which was normal.  (R. at 394.)  On March 3, 2011, she was authorized for 12 physical therapy sessions to be held 3 times a week for 4 weeks at Liberty Healthcare Physical Medicine and Rehabilitation Center (Liberty Healthcare). (R. at 366-368, 370.)  Her chief complaint was right knee pain and popping, and the working diagnosis was a right medial meniscus tear.  (R. at 366.)  Her treatment goals were to decrease inflammation, increase range of motion, and strengthen areas of functional deficit.  (*Id.*)

Plaintiff underwent a magnetic resonance imaging (MRI) of her right knee on March 21, 2011, which revealed a meniscal tear.  (R. at 392.)

On April 5, 2011, Dr. Shashi Rao conducted a functional capacity evaluation at Liberty Health Care.  (R. at 371.)  Plaintiff presented with an excessive kyphotic curve that was unrelated to her injury as well as pain at a 4 on a scale of 0-10.  (*Id.*)  She had a slight limp with decreased weight bearing on the right.  (*Id.*)  A pinwheel examination was within normal limits for the lower extremities, and her bilateral patellar and achilles reflexes were normal, symmetric, and brisk.  (*Id.*)

3

Muscle testing revealed moderate weakness in the right lower extremity, and her range of motion was restricted in the right knee. (*Id.*) Plaintiff scored a 0 out of 5 on Waddell's signs, indicating a lack of non-organic symptomology. (*Id.*) Dr. Rao noted that she showed good improvement with her rehabilitation. (R. at 376.) Her range of motion had increased significantly, yet there was still some functional deficit, but she did not want surgical intervention. (*Id.*) Based on her positive progress and ongoing functional deficit, he requested 6 more physical therapy sessions in order to get her strong enough to return to normal work duties and avoid surgery. (*Id.*) On April 6, 2011, Plaintiff was authorized for 6 additional physical therapy sessions for 3 times a week for 2 weeks. (R. at 576-577.)

On April 11, 2011, Plaintiff presented to Dr. Terry D. Madsen, M.D., an orthopaedic surgeon at Bush Renner Orthopaedics, P.A., for a consultation for her right knee pain. (R. at 345.) She had moderate pain with activity. (*Id.*) She had tried 14 physical therapy sessions and had taken pain medications, but she did not have any relief. (*Id.*) Upon examination, Dr. Madsen noted that she was a healthy appearing individual in no distress. (R. at 346.) Her right knee was positive for medial joint line pain, effusion, patella grind, memurray, squat, and hyperextension. (*Id.*) There was no pain over the pes bursa, and she had a negative Lachman's. (*Id.*) He assessed her with right knee strain and medial meniscal tear. (*Id.*) His plan was to get workers' compensation approval for a cortisone injection in her right knee. (*Id.*)

Plaintiff received another functional capacity evaluation on April 25, 2011. (R. at 347.) She reported her pain as a 5 on a scale of 0-10. (*Id.*) A pinwheel examination was again within normal limits for the lower extremities. (*Id.*) Her biceps, triceps and bracioradialis reflexes, which were tested bilaterally, were found to be normal, symmetric, and brisk. (*Id.*) Muscle testing revealed mild

4

weakness in the right lower extremity, and her range of motion was still restricted in the right knee. (*Id*.)  Plaintiff scored a 0 out of 5 on Waddell's signs.  (*Id*.)  Her evaluator noted that she completed her therapy and had shown some progress, but it was not what was anticipated.  (R. at 351.)  She would most likely require surgical intervention.  (*Id*.)  On May 24, 2011, Plaintiff was authorized for 2 additional physical therapy sessions for therapeutic exercises.  (R. at 571-573.)

On June 23, 2011, Plaintiff presented to  Dr. J. Teig Port, M.D. at the Orthopaedic Center of Mesquite due to her knee injury.  (R. at 758.)  Dr. Port noted that Plaintiff had been laid off from work a month and half earlier and had not worked since then.  (*Id*.)  She had no swelling in her right knee, but there was marked medial joint line tenderness.  (*Id*.)  X-rays of her right knee were normal. (R. at 759.)

At the request of the Texas Department of Insurance, Division of Workers' Compensation, Plaintiff underwent a medical evaluation by Dr. Pohn P. Inthanousay, D.O., on July 6, 2011.  (R. at 405-407.)  Plaintiff reported that her right knee continued to bother her on a constant basis, and the pain waxed and waned with activities.  (R. at 405.)  Her pain was a 5 out of 10 on average, and it was worse with prolonged standing, climbing stairs, and knee bending.  (*Id*.)  Physical examination revealed a normal gait, no acute distress, and the ability to sit and rise from a chair without difficulty.  (R. at 406.)  Plaintiff was unable to walk on her toes and heels because of the pain in her right knee, however.  (*Id*.)  There was tenderness to palpation on the medial aspect of her right knee and joint crepitus, but no swelling or limb length discrepancy.  (*Id*.)  There was a slight decreased range of motion in all planes.  (*Id*.)  Dr. Inthanousay found that she had not reached her maximum medical improvement (MMI), and noted that according to the Division of Workers' Compensation Guidelines, MMI is "the earliest date after which, based on reasonable medical probability, further

material recovery from or lasting improvement to an injury can no longer reasonably be anticipated." (R. at 407.) He noted that she was scheduled for surgical intervention and should be given 3 months to recover from surgery. (*Id*.)

Plaintiff underwent an arthroscopy on her right knee with a partial synovectomy by Dr. Port on July 20, 2011. (R. at 727-732, 813.) She returned to him on July 22, 2011. (R. at 757.) He noted that she was doing well after her operation, and she could not fully flex the knee but could walk short distances in the room without needing a cane or crutches. (*Id*.) He ordered outpatient therapy for her knee with Ryan Hankins, L.A.T. at the Orthopaedic Center of Mesquite, for 3 times per week for a month. (R. at 810-811.)

On July 29, 2011, Dr. Port noted that Plaintiff's right knee "gave way" a couple of times and was weak. (R. at 756.) He told her to follow up in about 3 to 4 weeks. (*Id*.) On August 26, 2011, she was feeling better because she had started therapy. (*Id*.)

Between August 12, 2011 and September 16, 2011, Plaintiff attended physical therapy with Mr. Hankins. (R. at 799-810.) On September 16, 2011, he reported that it was her last day on her current therapy script, and she was being discharged to her home exercise program (R. at 779.)

On September 22, 2011, Mr. Hankins performed a functional capacity evaluation. (R. at 693.) He noted that Plaintiff demonstrated normal ambulation quality and normal gross coordination. (*Id*.) She reported mild pain in her right knee primarily doing lifting, carrying, pushing, and pulling activities, and she had pain with deep knee bending activities. (*Id*.) She was able to sit, stand, and drive for up to 30 minutes, and she was able to walk 200 yards in 2 minutes. (*Id*.) She had pain in her knee during the squatting, kneeling, and crawling activities. (*Id*.) She also reported pain rating at a 6 on a scale of 0 to 10 through the lifting activities. (*Id*.) She was able to

lift up to 30 pounds squatting from floor-to-waist and bending at the waist in a kyphotic and lordotic lift, and Mr. Hankins recommended that she be limited to no more than 30 pounds occasionally. (R. at 693-694.)  Plaintiff lifted up to 20 pounds from waist-to-shoulder and up to 15 pounds overhead, and he recommended that she be limited to no more than occasional lifting of up to 20 pounds. (*Id.*) She was able to carry up to 20 pounds, and push and pull up to 70 pounds. (*Id.*) He found she could occasionally push and pull up to 50 pounds. (R. at 694.)  Mr. Hankins found that Plaintiff would benefit from additional strengthening and stabilization in her right knee. (R. at 694.) He believed she could go back to work at light duty up to 6 hours per day. (*Id.*)

She saw Dr. Port on September 23, 2011.  (R. at 755.)  He noted that she had shown generalized improvement in the knee, and that she had a 20-pound maximum with lifting and other restrictions consistent with her functional capacity evaluation.  (*Id.*)

Plaintiff presented to Mr. Hankins on September 25, 2011, and reported continued improvement in her right knee with almost no pain and only mild stiffness. (R. at 780.)

On October 7, 2011, Plaintiff presented to Dr. Port. (R. at 691.)  She reported continued improvement in her right knee, but she had mild stiffness and aching under the right patella. (*Id.*) She was able to do her activities of daily living, housework, yard work, and the majority of her hobbies. (*Id.*)  Dr. Port found that she had no tenderness to palpation, and her movements were normal. (*Id.*) He assessed her with status post chondroplasty in the right knee, and he noted that she was doing very well in her recovery. (*Id.*)  He recommended that she continue therapy for one more week to improve strength in her right quadriceps and to work on improving her ability to do deep knee bending activities. (*Id.*)

Plaintiff returned to Dr. Port on October 13, 2011, and reported continued improvement with

her right knee.  (R. at 690.)  She noted mild soreness and pressure under the right patella, but she was otherwise doing well.  (*Id*.)  Dr. Port found that there was no tenderness to palpation, and her movements were normal.  (*Id*.)  He assessed her with status post chondroplasty of the right knee, and he recommended continuing her therapy 2 times a week for 2 more weeks.  (*Id*.)

On October 14, 2011, Plaintiff was still having trouble with her right knee.  (R. at 754.)  Dr. Port recommended viscosupplementation injection treatments to the right knee because topical nonsteriodal anti-inflammatory drugs did not give her relief.  (*Id*.)  Between November 15, 2011 and December 20, 2011, Plaintiff received 5 Supartz injections in her right knee. (R. at 749-753.)

On January 5, 2012, Plaintiff presented to Dr. Port.  (R. at 747.)  She reported not having much improvement at that point from the injections.  (*Id*.)  He recommended that she increase her topical agent and do her home exercise program.  (*Id*.)

On January 6, 2012, Dr. Frank Flory, M.D., completed a medical evaluation at the request of the TDI-Division of Workers' Compensation.  (R. at 713-716.)  Plaintiff was able to sit and rise from a chair without difficulty as well as able to walk on her toes and heels without problem.  (R. at 715.)  She had no tenderness, joint crepitation, or joint swelling in her right knee.  (*Id*.)  Her range of motion appeared decreased in flexion to about 90 degrees in the supine position.  (*Id*.)  Dr. Flory attempted to achieve the maximum amount of flexion in her right knee, but Plaintiff lurched, began crying, and almost screamed due to a pop she felt.  (*Id*.)  He was unable to attempt any further testing due to her reaction.  (*Id*.)  He noted that he was unable to determine her maximum medical improvement because of the extreme pain she had, which he believed to be quite real.  (*Id*.)

Plaintiff returned to Dr. Port on January 12, 2012, and reported that her removable right knee brace helped her a little.  (R. at 746.)  She had pain when traveling up and down the stairs, but her

range of motion was relatively full.  (*Id*.)  He opined that she could do light duty work at 20 pounds maximum lifting.  (*Id*.)  He noted on February 1, 2012, that he did not have any disagreements with Dr. Flory's January 6, 2012 examination.  (R. at 745.)

On February 2, 2012, Plaintiff still complained of intermittent pain in her right knee.  (R. at 745.)  She reported that she fell on her knee and right shoulder.  (*Id*.)  Dr. Port noted that clinically, the knee showed no swelling, full range of motion, mild medial joint line tenderness, and stable cruciate and collateral ligaments in stress testing.  (*Id*.)

Plaintiff continued to have pain in her right knee on March 8, 2012, and Dr. Port found that she was at a light duty work status with maximum 25 pounds lifting due to difficulty in bending her knee.  (R. at 744.)

On March 12, 2012, a state agency medical consultant (SAMC) completed a Psychiatric Review Technique (PRT) form for Plaintiff.  (R. at 434-446.)  The SAMC found that Plaintiff had medically determinable impairments of ADHD and MDD (recurrent, mild) that did not precisely satisfy the requirements of an organic mental disorder under the listings in section 12.02 of 20 C.P.R. Part 404, Subpart P, Appendix 1 and for an affective disorder under section 12.04 of the listings, respectively.  (R. at 435, 437.)  She noted that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (R. at 444.)  The consultant's notes associated with the PRT referenced Plaintiff's visit to Green Oaks Hospital where she reported being stressed out by her mother's Alzheimer's and taking Prozac.  (R. at 446.)  She noted that Plaintiff presented to Hickory Trail Hospital after only one day at Green Oaks and provided a different medication and family history.  (*Id*.)  She referenced Dr. Arumugham's notes

that Plaintiff was doing well, had mild depression, and presented stable. (*Id.*) She noted the February 17, 2012 examination notes where Plaintiff reported she was "doing ok," had minimal depression, and had no problems with thought process or content. (*Id.*) She also noted that Plaintiff prepared daily meals, had limited problems with personal care due to her knee, did home chores, drove, shopped, handled all aspects of her finances, socialized on the weekends, and searched the internet daily. (*Id.*) Finally, she stated that Plaintiff was somewhat limited by psychiatric symptoms but the symptoms did not wholly compromise her ability to function independently, appropriately, and effectively on a sustained basis; her functional limitations were less than marked; and the alleged severity and limiting effects from her impairments were not wholly supported. (*Id.*)

The SAMC also completed a Mental Residual Functional Capacity Assessment (MRFCA) on March 12, 2012. (R. at 448-451.) She found Plaintiff not significantly limited to moderately limited in various aspects of understanding and memory and sustained concentration and persistence as well as various aspects of social interaction and adaptation. (*Id.* at 448-449.) She assessed Plaintiff's functional capacity as follows: "Claimant can understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work setting." (R. at 450.) She also noted that Plaintiff's allegations were not fully supported. (*Id.*)

On March 13, 2012, Teresa Fox, M.D., a SAMC, completed a physical RFC assessment for Plaintiff. (R. at 452-458.) She noted a primary diagnosis of right knee strain/medial meniscal tear. (R. at 452.) She opined that Plaintiff had the physical residual capacity (RFC) to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (with normal breaks) for about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; push

and pull an unlimited amount of weight with hand and/or foot controls; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; with no manipulative, visual, communicative, or environmental limitations. (R. at 453-456.)  In support of the exertional limitations, she referenced Plaintiff's February 25, 2011 x-ray, her March 21, 2011 MRI, her April 11, 2011 assessment as well as her examinations on July 6, 2011, July 20, 2011, and February 20, 2012.  (R. at 454.)  She also noted that Plaintiff's allegations regarding her symptoms were not fully supported by the evidence in the file.  (R. at 457.)

On April 6, 2012, Plaintiff presented to Dr. Port complaining that her right shoulder still bothered her, and she had pain when reaching overhead and could not lay on the shoulder.  (R. at 743.)  Physical examination revealed mild tenderness in the anterior subacromial space, and pain when reaching overhead.  (*Id.*)  She had relatively good active range in the shoulder, however.  (*Id.*)  She also had a little tenderness over the AC joint, but abduction of the shoulder across the midline did not increase her symptoms.  (*Id.*)  Resisted abduction caused some mild pain as did external rotation.  (*Id.*)  AP/Y scapular views of the right shoulder did not show any definite, obvious abnormality.  (*Id.*)  Dr. Port assessed her with a traumatic bursitis/rotator cuff tendinitis of the right shoulder.  (*Id.*)  On April 12, 2012, he gave Plaintiff an injection in her right shoulder.  (R. at 742.)

On April 19, 2012, Dr. Jim Cox, Ph.D, a SAMC, completed a Case Assessment for reconsideration of the March 12, 2012 PRT.  (R. at 460.)  Based upon the evidence in the file, he reaffirmed the PRT.  (*Id.*)

On April 23, 2012, Laurence Ligon, M.D., a SAMC, completed a Case Assessment for reconsideration of the March 13, 2012 physical RFC assessment.  (R. at 462.)  Based upon the evidence in the file, he reaffirmed the physical RFC.  (*Id.*)

On May 17, 2012, Plaintiff reported to Dr. Port that her right shoulder was doing better post-injection. (R. at 741.) She slowly achieved overhead range of motion, and she did not have crepitus in her shoulder. (*Id*.)

On June 29, 2012, Dr. Ronald E. Heisey, M.D., evaluated Plaintiff at the request of the Division of Workers' Compensation. (R. at 705.) He assigned a 0% Whole Person Impairment Rating, and opined that Plaintiff reached MMI on March 8, 2012. (*Id*.) Dr. Heisey reported that Plaintiff had full range of motion as of March 8, 2012, and she had a good response to the Supartz injections. (*Id.*) She continued to have pain from the arthritis in her knee, but he believed the pain was related to a pre-existing arthritic problem as opposed to her industrial accident. (*Id*.) Examination of the right knee revealed three small well-healed arthroscopic scars but no swelling, no erythema, and no increased heat on palpation in the right knee. (R. at 711.) Her right shoulder examination revealed slight tenderness to palpation over the anterior shoulder. (*Id*.) There was no weakness noted, and there was no pain noted with the motion. (*Id*.)

On July 19, 2012, Plaintiff followed up with Dr. Port regarding her right shoulder bursitis and right knee sprain. (R. at 740.) He reviewed Dr. Heisey's exam, and although he had no problem with the 0% impairment for range of motion, he found there was a 2% warranted for her chondral fracture. (*Id*.)

On October 18, 2012, after considering Plaintiff's right shoulder injury, Dr. Port changed her previous 2% Whole Person Impairment Rating to a net 7% Whole Person Impairment Rating. (R. at 774.) He noted that there was a clinical maximum improvement date of July 19, 2012, on which date he determined that the right shoulder was stable. (R. at 775.) He had previously listed an improvement rating in March 2012, but that one did not take into account the fact that Plaintiff

did not have treatment for her shoulder, and it was not in a stable and static state at that time.  (*Id.*)

On November 19, 2012, Plaintiff presented to Dr. Port for a recent fall on her right knee and shoulder pain.  (R. at 771.)  She noted that due to her knee injury, she would walk around the house grabbing onto objects and pushing off with her right arm.  (*Id.*)  That caused pain in her right shoulder, and she had previously been diagnosed with shoulder bursitis from her February 8, 2011 work injury.  (*Id.*)  Examination of her right shoulder revealed relatively full range of motion but pain with reaching overhead.  (*Id.*)  There was pain in the anterior subacromial space with mild crepitus.  (*Id.*)  She also had swelling in her suprapatella postoperative changes laterally.  (*Id.*)

On November 30, 2012, Plaintiff underwent an MRI of her right knee, which revealed an acute full-thickness ACL tear with posterier tibial plateau bone bruising.  (R. at 831-832.)

On December 4, 2012, Dr. Port noted a follow-up MRI scan on her right knee, which revealed partial thickness cartilage thinning along the median ridge of the patella.  (R. at 770.)  There was also bone bruising in the posterolaterial tibial plateau, which must have occurred during her recent fall.  (*Id.*)  He found that the recent fall gave her a chondral injury in addition to her previous ACL tear and medial meniscus tear.  (*Id.*)  On December 14, 2012, Dr. Port noted that the partial ACL tear noted during his July 20, 2011 surgery had progressed to a complete tear, causing instability.  (R. at 769.)  He therefore believed an ACL and meniscus surgery was necessary.  (*Id.*)

On January 21, 2013, Dr. Port gave Plaintiff an injection for her right shoulder.  (R. at 736.)  He noted that she still had symptoms, and x-rays had been negative for osseous abnormalities.  (*Id.*)  He recommended that she undergo an MRI of the shoulder to rule out rotator cuff tear or any kind of symptomatic SLAP type legion that may be bothering her with overhead reaching and lifting.  (*Id.*)  He found that she was still symptomatic after a full therapy program for her shoulder and at

least two cortisone injections.  (*Id*.)

On January 25, 2013, Plaintiff underwent an MRI of her right shoulder.  (R. at 765.)  It revealed a supraspinatus tendinosis with a superimposed articular surface partial tear at the humeral attachment, infraspinatus tendinosis without a tear, moderate spurring and edema of the acromioclavicular joint, and internal degeneration of the superior labrum.  (R. at 766.)

Plaintiff presented to Dr. Port on February 5, 2013.  (R. at 735.)  She had medial joint space tenderness in her right knee, as well as pain in her right shoulder.  (*Id*.)  Dr. Port noted that a partial tear was seen on her MRI scan, and he told her that the partial tear could be treated with injections and therapy.  (*Id*.)  She had only brief relief of her right shoulder pain with the cortisone injection given two weeks prior, and she still had pain reaching overhead.  (*Id*.)  He assessed her with partial thickness cuff tear supraspinatus tendon right shoulder and medial meniscus tear and ACL tear in the right knee.  (*Id*.)  He recommended that she do at least a partial medial meniscectomy of the right knee, and that she realistically could not expect to have right shoulder surgery and knee surgery at the same time.  (*Id*.)  He suggested she recover from the knee surgery, do rehabilitation with her knee and shoulder, and consider shoulder surgery at a later date if she did not get better with therapy. (*Id*.)

On February 12, 2013, Dr. Arumugham completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) as to Plaintiff.  (R. at 657-659.)  He found Plaintiff not limited in understanding, remembering, and carrying out simple instructions; mildly limited in understanding, remembering, and carrying out complex instructions; and mildly limited in her ability to interact appropriately with supervision, co-workers, and the public as well as respond to changes in a routine work setting.  (R. at 657-658.)  He noted that she had not worked since 2011, and she

14

had been diagnosed with attention deficit disorder, major depressive disorder, and chronic insomnia. (R. at 658.)  She was also taking medication and was hospitalized for depression.  (*Id.*)

### 3.     Hearing Testimony

On January 24, 2013, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 35-67.)  Plaintiff was represented by an attorney.  (*See id.*)  Her attorney stated that her treating physician, Dr. Arumugham, had been out of the country and would not be back until the next week, so they had not been able to get updated records.  (R. at 38.)  The ALJ agreed to leave the record open for 20 days following the hearing to allow time to get the records.  (R. at 40.)

### a.     *Plaintiff's Testimony*

Plaintiff testified that she was 44 years old and had an eleventh grade education.  (*Id.*)  She was receiving unemployment benefits, and she was in a Texas Workforce Commission program called Work in Texas.  (R. at 40-41.)  She was taking classes to get her GED through the program. (*Id.*)

Her only work in the past 15 years was at Blockbuster where, as a lead worker, she put employees "at locations" and had them trained "in their areas."  (R. at 42-43.)  While on the job, her knee popped as she was walking down stairs.  (R. at 43.)  She filed for workers' compensation benefits, and they were covering the medical expenses for her knee.  (*Id.*)  The Division of Workers' Compensation found that she reached her MMI, but her doctor appealed it and wanted to do an additional surgery on her knee.  (*Id.*)  Her workers' compensation benefits were still pending at that time.  (*Id.*)

Her husband was working, and she had a 17 year old daughter at home.  (R. at 44-45.)

As for her psychiatric issues, she testified that she had high anxiety and took Klonopin for

it.  (R. at 45-46.)  She was not able to sleep, and her mind raced with thoughts.  (R. at 45.)  She took Tramadol in order to sleep almost every night.  (*Id*.)

She testified that her mental problems affected her ability to concentrate in her GED classes, and she had trouble focusing on her math assignments while the teacher and other students were discussing other subjects.  (R. at 45-47.)   Since she had already passed the other subjects and needed to focus only on her math, the teacher let her go into another room to complete the math assignments.  (R. at 47.)

When the ALJ asked if Blockbuster had long-term or short-term disability, she stated that they were struggling and laid her off in April 2011.  (*Id*.)  She did not get unemployment at that time but had been on workers' compensation benefits from that point.  (*Id*.)  She was currently getting $644 about every 2 weeks.  (R. at 49.)

She had fallen on her knee 3 times after her first surgery, and Dr. Port wanted to do another surgery on her right ACL.  (*Id*.)  She tried to catch herself during one of her falls and hurt her right shoulder, causing bursitis.  (*Id*.)  He gave her cortisone shots in that shoulder, but she was going to have an MRI on her shoulder the next day.  (R. at 50-51.)  Her workers' compensation benefits were covering her right shoulder as well.  (R. at 51.)

She had a hernia in her back in 2010, and it was doing well.  (*Id*.)

She had knee issues when going to the grocery store, and her anxiety caused fear that her family was talking about her while she was at the store.  (R. at 52.)  Her anxiety built up, and she started thinking that she could not find her way to places she had been to several times.  (*Id*.)

The ALJ asked her if she would have problems keeping a job in which she was primarily sitting down, making phone calls, and not doing a lot of lifting.  (*Id*.)  She said her problem with that

job would be answering the phone with her anxiety issues. (*Id.*) She would also have a problem getting information from her manager. (*Id.*) Although she might look as if she was listening, she might not absorb what he was saying. (*Id.*) The prolonged sitting would not be a problem. (*Id.* at 53.)

She still had a bit of pain in her right knee at night. (*Id.*) Her problem focusing, however, was more emotional because of her pain. (*Id.*)

She claimed that her mental problems did not really affect her home life unless there was a financial issue or her daughter was causing her or her husband stress. (R. at 47.) About one week out of the month, she had a bad day due to her anxiety. (R. at 54.) She was short-tempered and agitated because she did not understand exactly what her family was asking her at times. (R. at 55.) She would isolate herself so that she would not cause friction. (*Id.*) This is when her medication would help her. (R. at 48.) She was, however, able to have normal conversations with them. (R. at 55.) She was not sure what was causing the anxiety, however. (R. at 58.) The Klonopin and Adderall were helping. (R. at 59.)

### b.     VE's Testimony

The VE testified that Plaintiff's past relevant work history was as a lead worker, Blockbuster, which was a video sales associate (DOT 271.357-014, light, semi-skilled, SVP:4). (R. at 62.) The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education, and work experience could perform any work with the following limitations: simple 1 to 2 step tasks that could be learned in 30 days and were repetitive in nature; could understand, remember, and carry out no simple tasks or instructions; make decisions; attend and concentrate for extended periods; accept instructions; and respond appropriately to routine work changes. (R. at 63.) The ALJ

acknowledged that such a hypothetical person would not be able to do Plaintiff's past work with the limitations of performing simple 1 to 2 step repetitive tasks. (*Id*.) The VE testified that such a person could perform unskilled, full, or sedentary work. (*Id*.)

The ALJ added the limitation that the hypothetical person had periods where she isolated herself due to mental impairments, which included depression and anxiety, notwithstanding treatment. (*Id*.) The hypothetical person could not handle even low-stress type of situations, and so she would consistently miss work 2 days a month on the average. (R. at 63-64.) The VE testified that there would be no jobs available with the additional limitation. (R. at 64.)

The ALJ then added that such a hypothetical person could get to work everyday and stay at work, but her concentration was shortened due to her mental impairments. (*Id*.) She would have racing thoughts even on simple tasks that she learned by repetition, and she would stay at her job area but would lose concentration for about 1 hour out of an 8-hour day. (*Id*.) The VE testified that such a person would not be able to perform any work. (*Id*.)

Next, the ALJ modified the hypothetical such that the person was at work everyday, but there were times when she was just overwhelmed with a concentration or anxiety problem and needed to be away from the worksite. (*Id*.) She would need an additional 15-minute break each day. (R. at 65.) The VE testified that such hypothetical person would be unable to maintain employment. (*Id*.)

Plaintiff's attorney then modified the hypothetical to include a person with a very significant problem, such that she would not be able to accept instructions or respond appropriately to criticism from her supervisor. (*Id.*) The VE testified that such a person would be unable to maintain employment. (*Id*.)

Finally, the ALJ provided one last modification. (R. at 66.) The hypothetical person would

have trouble adapting to routine work that occurred consistently every other day or even once a week. (*Id*.) The VE again testified that such an individual could not maintain employment. (*Id*.)

## C.      ALJ's Findings

The ALJ issued his decision denying benefits on April 8, 2013. (R. at 19-28.) At step one, he found that Plaintiff had not engaged in substantial gainful activity since April 20, 2011, the alleged onset date. (R. at 21.) At step two, the ALJ found that Plaintiff had three severe impairments: chondroplasty of the right knee, attention deficit hyperactivity disorder (ADHD), and major depressive disorder (MDD), recurrent, mild. (*Id*.) Despite those impairments, at step three, he found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.) The ALJ next determined that Plaintiff had the RFC to perform a full range of sedentary work, and that she could stand/walk for up to 2 hours a day, could lift up to 10 pounds, and could perform unskilled work activity. (R. at 22.) At step four, the ALJ determined that Plaintiff could not perform any past relevant work. (R. at 27.) At step five, considering Plaintiff's age, education, work experience, and RFC, he found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. (R. at 28.) Accordingly, he determined that Plaintiff was not disabled within the meaning of the Social Security Act at any time between her alleged onset date of April 20, 2011, and the date of her decision. (*Id*.)

## II.   ANALYSIS

## A.      Legal Standards

### 1.      Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*. at 436 and n.1.

## 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.   An individual who does not have a "severe impairment" will not be found to be disabled.

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.   If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.   If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the

burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.** **Issues for Review**

Plaintiff presents one issue for review:

Whether the ALJ's RFC finding is supported by substantial evidence.

(doc. 12 at 1.)

**C.** **RFC**

Plaintiff argues that the ALJ's RFC finding that she is able to perform the full range of unskilled, sedentary work is not supported by substantial evidence. (doc. 12 at 4.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2003). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R.

§ 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence". *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations and "careful consideration of the entire record," the ALJ determined that she had the RFC to perform a full range of sedentary work as defined in 20 C.F.R. 404.1567(a), and could walk for up to 3 hours a day, lift up to 10 pounds, and perform unskilled work activity. (R. at 22.)

23

###   1.   Mental RFC

Plaintiff contends that the ALJ's mental RFC finding is not supported by his "Paragraph B"

criteria findings at step three. (doc. 12 at 5.) She claims that while the ALJ found that she had

moderate difficulties in her social functioning as a result of her MDD, he failed to incorporate any

limitations in his RFC finding to reflect those difficulties. (*Id.*) He therefore erred by failing to

discuss how her moderate difficulties in social functioning would affect her ability to perform basic

work-related activities. (*Id.*) Plaintiff is essentially arguing that the ALJ erred by failing to perform

a function-by-function analysis of her work limitations - specifically, her limitations in social

functioning.

###   a.   Function-by-Function Analysis

When a claimant is found to have a mental impairment, the ALJ must determine its severity

by evaluating "the degree of functional loss resulting from the impairment in four separate areas

deemed essential for work." *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) (citing 20 C.F.R.

§ 404.1520a(b)(3)). These areas are: (1) activities of daily living; (2) social functioning; (3)

concentration, persistence, and pace; and (4) episodes of decompensation.[1]   20 C.F.R.

§ 404.1520a(c)(3) (2011); 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00C. This rating process is

known as  "the psychiatric review technique" or the "technique." *Owen v. Astrue*, No. 3:10-CV-

1439-BH, 2011 WL 588048, at *14 (N.D. Tex. Feb. 9, 2011). If the mental impairment is severe

but does not meet or medically equal a listed impairment, the ALJ must conduct an RFC assessment.

---

[1]   These four functional areas are known as the "paragraph B criteria." *See* 20 C.F.R. Pt. 404, Subpt. P,
App. 1 § 12.00C. The first three are rated on a five-point scale, as either none, mild, moderate, marked, or extreme,
and the fourth is rated on a four-point scale, ranging from "none" to "four or more episodes." *See* 20 C.F.R.
§ 404.1520a(c)(4) (2012). If the first three functional areas are rated as "none" or "mild" and the fourth area is rated
as "none," the impairment will generally be found not to be severe. *Id.* § 404.1520a(d)(1).

20 C.F.R. § 404.1520a(d)(3); *Boyd*, 239 F.3d at 705.

Before making an RFC determination, the ALJ must perform a function-by-function assessment of the claimant's capacity to perform sustained work-related physical and mental activities "based upon all of the relevant evidence" and taking into account "both exertional and nonexertional factors." *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (citing SSR 96-8P, 1996 WL 374184, at *3–6 (S.S.A. July 2, 1996)). "While the ALJ is not required to use the exact language from his psychiatric review technique, he must consider all of [the claimant's] limitations, including those found in the technique." *Owen*, 2011 WL 588048, at *14. Specifically, the ALJ must itemize the "various functions contained in paragraph[] B ..." and express them "in terms of work-related mental activities." SSR 96-8P, 1996 WL 374184, at *5–6. These activities "include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id.* at *6; *see also* 20 C.F.R. § 404.1545(c) (2012). "[W]ithout the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work" at step four or perform other "types of work" at step five. SSR 96-8P, 1996 WL 374184, at *3–4; *accord Myers*, 238 F.3d at 620. Notably, even if the ALJ fails to conduct a function-by-function analysis, he satisfies this requirement if he bases his RFC assessment, at least in part, on a state medical examiner's report containing a function-by-function analysis. *Beck v. Barnhart*, 205 F. App'x 207, 213–14 (5th Cir. 2006) (per curiam); *Onishea v. Barnhart*, 116 F. App'x. 1 (5th Cir. 2004) (per curiam).

Here, after steps two and three and before proceeding to step four, the ALJ determined that

Plaintiff had the mental RFC to perform unskilled work.  (R. at 22.)  The ALJ did not conduct a function-by-function analysis of her mental work-related activities listed in SSR 96-8p and 20 C.F.R. §1545(c), and he did not appear to rely on a state medical or psychiatric consultant's function-by-function assessment.  Although he "accept[ed]" the March 12, 2012 PST, which was completed by a SAMC, it did not contain a function-by-function assessment.  (*See* R. at 26, 434-446.)  He also  referenced the MRFCA, which did contain a function-by-function assessment, in noting that a SAMC found that Plaintiff could perform detailed tasks.  (R. at 27.)  He did not indicate that he accepted, adopted, or assigned any particular weight to the MRFCA, but he did note that he reduced Plaintiff's mental RFC to simple 1-2 step tasks, so it does not appear that he relied on a SAMC's function-by-function assessment.  The ALJ therefore committed error.  *See Owen*, 2011 WL 588048, at *15 (holding that the "ALJ committed error" in failing to perform a "detailed function-by-function analysis of [the claimant's] mental limitations in accordance with SSR 96–8p"); *Otte v. Comm'r, Soc. Sec. Admin.*, No. 3:08-CV-2078-P BF, 2010 WL 4363400, at *12 (N.D. Tex. Oct. 18, 2010), *rec. adopted*, 2010 WL 4318838 (N.D. Tex. Oct. 27, 2010) (holding that the ALJ committed reversible error where "he made no narrative function-by-function assessment of [the claimant's] capabilities for work-related mental activities" but limited him only to "unskilled light and sedentary work"); *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 815–16 (E.D. Tex. 2006) (finding error where the ALJ did "not incorporate a function-by-function assessment into his decision" but "only recited strength demands for light work generally").

### b.     Prejudice

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are

affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988).  "[R]emand for failure to comply with a *ruling* is appropriate only when a complainant affirmatively demonstrates ensuant *prejudice*." *Bornette*, 466 F. Supp. 2d at 816 (citing *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)) (emphasis in *Bornette*).  "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).  Accordingly, to establish prejudice warranting remand, Plaintiff must show that consideration of the functional limitations the ALJ found in the psychiatric review technique and the work-related mental activities listed in SSR 96-8p that are related to her difficulties in social functioning might have led to a different decision.  *See Bornette*, 466 F. Supp. 2d at 816  (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)).

Plaintiff essentially argues that her claim was prejudiced because the ALJ did not consider and incorporate into her mental RFC assessment the moderate difficulties in social functioning he found in the psychiatric review technique.[2]  (doc. 12 at 5.)

The ALJ used the psychiatric review technique at steps two and three to find that Plaintiff was mildly restricted in activities of daily living and  moderately restricted in social functioning and in maintaining concentration, persistence, and pace.  (R. at 22.)  He explained that his RFC assessment "reflect[ed] the degree of limitation [he] ... found in the 'paragraph B' mental function analysis."  (*Id*.)  It is not clear that his RFC limitation to "unskilled work activity" incorporates or

_____

[2]She also claims that she suffered substantial harm at step five of the sequential process since the ALJ's finding that Plaintiff could perform the full range of unskilled sedentary work was used to rely upon the Medical-Vocational Guidelines to determine that Plaintiff is disabled.  (doc. 12 at 5.)  She contends that had the ALJ properly limited her RFC to incorporate Plaintiff's limitations based on her moderate difficulties in social functioning, the ALJ would not have been able to rely upon the Medical-Vocational Guidelines at step five.  (*Id*.)  As noted, however, even though he did not explicitly incorporate his findings regarding Plaintiff's moderate restrictions in social functioning, he did consider them when determining her mental RFC.  *Owen*, 2011 WL 588048, at *14.

accounts for Plaintiff's moderate difficulties in social function.  (*See id.*)  Nonetheless, his narrative discussion shows that he did consider Plaintiff's moderate difficulties in social functioning in assessing Plaintiff's RFC.  He referenced her testimony that she isolated herself because she did not want to cause friction in her family, and he noted that she socialized on the weekends and shopped.  (R. at 24, 25.)  He also noted that the SAMC stated that she had mild limitations in interacting with others, and that he reduced her mental RFC assessment to simple 1-2 tasks.  (R. at 27.)  He stated that the reduction to unskilled work took into consideration the family issues that she was dealing with to the furthest extent possible under the circumstances presented.  (*Id.*)  While it is not clear that his reduction to unskilled work necessarily took into account Plaintiff's moderate  difficulties in social functioning, it is clear that he considered them.

Although the ALJ did not incorporate the "exact language" of his technique, he considered Plaintiff's paragraph B limitations, including her moderate difficulties in social functioning, when determining her mental RFC.  Plaintiff has therefore failed to show that she was prejudiced by the ALJ's failure to explicitly incorporate his findings regarding her moderate restrictions in social functioning from the technique into her mental RFC or that remand is warranted on this basis.  *See Bordelon v. Astrue*, 281 F. App'x 418, 422–23 (5th Cir. 2008) (per curiam) (to warrant remand, a claimant must show prejudice resulting from the ALJ's omission of the paragraph B limitations from the RFC and resulting hypothetical).

### 2.      *Physical RFC*

Plaintiff argues that the ALJ's physical RFC finding is not supported by the substantial evidence of record, which demonstrates that she has limitations in her ability to reach.  (doc. 12 at 6.)  She argues that because her right shoulder use is limited and would impact her ability to

perform basic work-related activities, the ALJ erred by not evaluating the severity of the impairment in his decision, and limiting her RFC accordingly. (*Id*. at 8-9.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii),(c) (2012). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104–05 (5th Cir. 1985). Accordingly, to meet the severity threshold at step two, "the claimant need only . . . make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n. 5 (5th Cir. 1992) (citation omitted). "Because a determination [of] whether an impairment[] is severe requires an assessment of the functionally limiting effects of an impairment[], [all] symptom-related limitations and restrictions must be considered at this step." SSR 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996). Ultimately, a severity determination may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104.

Here, at step two, the ALJ found that Plaintiff's chondroplasty of the right knee, ADHD, and MDD were severe impairments. (R. at 21.) He did not address or even mention Plaintiff's shoulder pain at step two. (*See id*.) Her shoulder pain could reasonably be said to constitute a

"medically determinable impairment" because it was "demonstrable by medically acceptable clinical and laboratory techniques," such as Dr. Port's April 6, 2012 diagnosis of traumatic bursitis/rotator cuff tendinitis of the right shoulder, the January 25, 2013 MRI of Plaintiff's right shoulder, and Dr. Port's February 5, 2012 assessment of partial thickness cuff tear supraspinatus tendon of the right shoulder.  (*See* R. at 735, 743, 765); *see also* 42 U.S.C.A. § 423(d)(3) (West 2004) ("[A] 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.").  The ALJ's failure to determine the severity of Plaintiff's shoulder impairment at step two as required by 20 C.F.R. § 404.1520(a)(4)(ii),(c) was legal error.  *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 838 (N.D. Tex. 2008) (explaining that violation of a regulation constitutes legal error).

Nevertheless, courts in this Circuit have held that where the ALJ fails to specifically determine the severity of a claimant's impairments at step two, remand is not required where the ALJ proceeds to the remaining steps of the disability analysis and considers the alleged impairment's —or its symptoms—effects on the claimant's ability to work at those steps. *See, e.g.*, *Herrera*, 406 F. App'x at 3 and n.2; *Abra v. Colvin*, No. 3:12-CV-1632-BN, 2013 WL 5178151, at *4 (N.D. Tex. Sept. 16, 2013) (listing cases).  This approach is consistent with fairly recent cases holding that an ALJ's failure to apply the correct standard at step two in determining the severity of the claimant's impairments (i.e., *Stone* error) "does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate [] where the ALJ proceeds past step two in the sequential evaluation process."  *Gibbons v. Colvin*, No. 3:12-CV-0427-BH, 2013 WL 1293902, at *14 (N.D. Tex. Mar. 30, 2013) (citing cases); *see also Taylor v. Astrue*, 706 F.3d 600,

603 (5th Cir. 2012) (per curiam) (applying harmless error analysis where the ALJ failed to cite *Stone* in finding at step two that the claimant's alleged mental impairment was non-severe). Accordingly, to obtain remand, Plaintiff must show that the ALJ's step two error was not harmless. *See Garcia v. Astrue*, No. CIV. M-08-264, 2012 WL 13716, at *12 (S.D. Tex. Jan. 3, 2012) ("Assuming . . . that the ALJ erred in failing to specifically address whether Plaintiff's right leg venous thrombosis was a severe impairment, the next question is whether the ALJ committed reversible error."). In the Fifth Circuit, harmless error exists when it is "inconceivable" that a different administrative determination would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Plaintiff argues that the ALJ's step two error was not harmless because had the ALJ properly limited her RFC to incorporate the restrictions associated with her right shoulder injury, the ALJ would not have been able to rely upon the Medical-Vocational Guidelines at step five to determine that she retains the ability to perform other work in the national economy. (doc. 12 at 9.)

To establish that work exists for a claimant at step five of the sequential disability determination process, the ALJ relies on the testimony of a VE in response to a hypothetical question or other similar evidence, or on the Medical-Vocational Guidelines promulgated to guide this determination, often referred to as "the Grids."[3] *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); 20 C.F.R. Pt. 404, Subpt. P, App. 2

---

[3] The Grids are divided into age categories, and the determination of whether an individual is presumptively disabled differs depending upon the age category and other factors. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

(2008).  An ALJ may rely exclusively on the Grids if the impairments are solely exertional,[4] or if

the nonexertional impairments do not sufficiently or significantly affect the RFC.  *Newton*, 209

F.3d at 458 (citing *Fraga*, 810 F.2d at 1304 (when "the claimant either suffers only from exertional

impairments or his non-exertional impairments do not significantly affect his residual functional

capacity, the ALJ may rely exclusively on the Guidelines in determine whether there is other work

available that the claimant can perform."")).  If the claimant suffers from nonexertional impairments,

or a combination of exertional and nonexertional impairments, then the ALJ must rely on the

testimony of a VE or other similar evidence to establish that such jobs exist in the economy.  *Id.*

After finding that Plaintiff's impairments did not meet or medically equal a listed

impairment, the ALJ assessed her RFC.  (*See* R. at 22-27.); *see also Boyd v. Apfel*, 239 F.3d 698,

705 (5th Cir. 2001) ("If the [claimant's] impairment is severe, but does not reach the level of a

listed disorder, then the ALJ must conduct a [RFC] assessment.")(citing 20 C.F.R.

§ 404.1520a(d)(3)). The ALJ determined that she had the RFC to perform a full range of sedentary

work and could stand/walk for up to 2 hours a day, could lift up to 10 pounds, and could perform

unskilled work.  (R. at 22.)

The ALJ was required to consider all "medically determinable impairments," including

those that were "not 'severe,'" as well as "all of the relevant medical and other evidence" in the

---

[4]  Under the Social Security regulations, impairments are either exertional or nonexertional.  Impairments
are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs.  The
classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs
by various exertion levels (sedentary, light, medium, heavy, very heavy) in terms of the strength demands for sitting,
standing, walking, lifting, carrying, pushing, and pulling.  All other impairments are classified as nonexertional.  *See
Holiday v. Barnhart*, 460 F. Supp. 2d 790, 806 (S.D. Tex. 2006) (citing *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir.
2000) and 20 C.F.R. § 404.1569(a)); *see also* SSR 96-9P (1996), 1996 WL 374185, at *5 ("[A] nonexertional
limitation is an *impairment-caused* limitation affecting such capacities as mental abilities, vision, hearing, speech,
climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling.
Environmental restrictions are also considered to be nonexertional." (emphasis original)).

record in assessing Plaintiff's RFC.  *See* 20 C.F.R. § 404.1545(a)(2)-(3) (2012); SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. 1996) ("While a 'not severe' impairment standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.").[8]  In his RFC narrative discussion, the ALJ explained that he "considered all [of Plaintiff's] symptoms ... and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. at 23.) He considered her February 2011 knee injury and noted that although her x-ray was normal, an MRI of her right knee in March 2011 showed knee strain and a meniscal tear. (R. at 24, 25.) He noted that an examination in June 2011 showed no swelling, but it revealed marked medial joint line tenderness. (*Id.*)  In July 2011, Plaintiff had a normal gait but was in acute distress. (*Id.*)  She had no muscle atrophy and only a slight decrease in her range of motion. (*Id.*)  She was also able to sit without difficulty and had 5/5 strength bilaterally. (*Id.*)  Following her surgery in February 2012, she continued to have knee pain, but she also appeared to be functional in her daily living activities, including shopping, driving, and walking for thirty minutes before needing to stop and rest. (*Id.*)

The ALJ also referenced the treatment notes from Liberty Healthcare, which indicated that Plaintiff reported continued knee pain and was on light duty until June 2011. (R. at 24.)  He also referenced the notes from the Orthopaedic Center of Mesquite following the chondroplasty of her knee, which stated that Plaintiff did well in recovery. (R. at 25.)  Plaintiff reported continued improvement in her knee and had no pain with sitting, driving, or lying down. (*Id.*)  Additionally,

---

[8] Even if the ALJ had implicitly found at step two that Plaintiff's shoulder impairment was not severe by excluding it from his step two discussion, he was still required to consider this impairment in assessing Plaintiff's RFC.

33

the ALJ noted that the doctor reported that Plaintiff could lift up to 20 pounds.  (R. at 24-25.)

Finally, he referenced her 0% Whole Person Impairment Rating on June 20, 2011.  (R. at 24, 26.)

He acknowledged that the 0% rating was increased to 7%, but found she still had no problem

sitting, and her treating source made it clear that she could lift and carry at least 10 pounds and

probably up to 20 pounds.  (R. at 26.)  Therefore, based on the objective findings with respect to

Plaintiff's knee as well as her activities of daily living, he assigned her a RFC at a full sedentary

exertional level.  (*Id.*)

Because Plaintiff could not perform any of her past relevant work, the ALJ proceeded to

step five and considered her RFC, age, education, and work experience, concluding that she could

perform jobs that existed in significant numbers in the national economy.  (R. at 28.)  He wrote:

> If the claimant can perform all or substantially all of the exertional demands at a given level
> or exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not
> disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When
> the claimant cannot perform substantially all of the exertional demands of work at a given
> level of exertion and/or has nonexertional limitations, the medical-vocational rules are used
> as a framework for decisonmaking unless there is a rule that directs a conclusion of
> "disabled" without considering the additional exertional and/or nonexertional limitations
> (SSR 83-11 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00
> in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-
> 15).  He did not rely on VE testimony.

(*Id.*)  Based on Plaintiff's RFC for the full range of sedentary work[9] combined with her age,

education, and work experience, he found that a finding of "not disabled" was directed by Medical

Vocational Rule 201.25.  (*Id.*)  The ALJ's RFC discussion only briefly discussed Plaintiff's alleged

shoulder impairment, noting her statement at the hearing that she had bursitis in the shoulder and

was getting cortisone shots.  (*See* R. at 24.)  The evidence before the ALJ showed an MRI of

---

[9]Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying
articles like docket files, ledgers, and small tools."  20 C.F.R.§ 404.1567.

Plaintiff's right shoulder taken on January 25, 2013, her treating source's April 6, 2012 diagnosis of traumatic bursitis/rotator cuff tendinitis of the right shoulder, and his February 5, 2012 assessment of partial thickness cuff tear supraspinatus tendon of the right shoulder.  (*See* R. at 735, 743, 765.)    Additionally, Dr. Port's treatment notes revealed Plaintiff had pain when reaching overhead, she had mild tenderness and swelling in her shoulder, he gave her injections for her shoulder, and she received therapy to help her shoulder pain, reaching, and lifting.  (R. at 736, 742-743, 771.)  Dr. Port also believed it was best to consider surgery at a later date if she did not get better with therapy.  (R. at 735.)

Because the ALJ did not reference this evidence in assessing Plaintiff's RFC, it is unclear whether he accounted for the effects of her shoulder impairment on her ability to perform work-related functions as required by the regulations.  *See* 20 C.F.R. § 404.1545(a)(1)-(3).  Although the ALJ acknowledged that Plaintiff's 0% Whole Person Impairment rating was subsequently increased to 7%, he failed to note that the increase was due to Dr. Port's consideration of Plaintiff's shoulder injury.  (*See* R. at 26, 774.)  Further, although he noted that Plaintiff's treating source opined that she could lift and carry at least 10 pounds and probably 20 pounds, that finding was made by a therapist in September 2011, not in March 2013 as the ALJ indicated.  (*See* R. at 24-26, 693.)  Plaintiff's shoulder injury occurred in 2012 and was not noted by any of the SAMCs in making their evaluations. (*See* R. at 745.) Consequently, it is unclear whether he considered the effects that this impairment may have on her ability to work at step five.  Although he included a limitation for a full range of sedentary work, he might have limited the amount of weight she could  lift with her right hand and arm, or he might have limited her reaching, handling, or fingering with her right hand if he considered her shoulder injury.  Therefore, it is not inconceivable that the ALJ would

have imposed greater restrictions in her RFC or would not have found a limitation for a full range of sedentary work if he had considered the effects of her shoulder impairment, including the nonexertional limitations.  Given the possibility of an RFC that was more restrictive than a full range of sedentary work or one that included nonexertional limitations, he then would not have been able to rely solely on the Medical-Vocational Guidelines at step five in order to determine that Plaintiff was not disabled.  *See Newton*, 209 F.3d at 458 (finding an ALJ may rely exclusively on the Grids if the impairments are solely exertional or if the nonexertional impairments do not sufficiently or significantly affect the RFC); SSR 96-9P (1996), 1996 WL 374185, at *5 (listing reaching, handling, and fingering as nonexertional limitations).

In sum, because it is not inconceivable that the ALJ would have reached a different determination at step five absent her step two error, the error was not harmless. *See Earl v. Colvin*, No. 3:13-cv-0382-BH, 2014 WL 1281452, at *8-11 (N.D.Tex. Mar. 28, 2014)(remanding where the ALJ failed to determine the severity of the plaintiff's medically determinable impairment at step two, and it was unclear whether she considered the effects that the impairment might have on Plaintiff's ability to work at step five because she did not address the alleged impairment); *Sullivan v. Colvin,* No. 3:12-cv-04460-BH, 2014 WL 1320098, at *13-14 (N.D.Tex. Mar. 31, 2014) (finding no harmless error at step two where the ALJ's RFC discussion did not reference the applicable evidence regarding Plaintiff's medicable determinable right shoulder injury, and it was therefore unclear whether he considered the effects that the alleged impairment might have on her ability to work at step five); *Corbitt v. Comm'r of Soc. Sec. Admin.*, No. 3:10-CV-558-CWR-LRA, 2013 WL 603896, at *5–6 (S.D. Miss. Feb. 19, 2013) (remanding where the "ALJ's decision show[ed] that he did not seriously consider the specific problems" that the claimant's "diabetes create[d]" either

at step two or "in the remainder of the five-step evaluation process to justify a finding of harmless error"); *compare to Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987) (finding "no ground" for remand where "the ALJ acknowledged" the claimant's alleged "significant impairment" at step two but found it to be non-severe, and "went on to find, pursuant to the fourth step of the sequential evaluation analysis, that [the] impairment did not disable [her] from performing her past sedentary work"); *Boothe v. Colvin*, No. 3:12-CV-5127-D, 2013 WL 3809689, at * 5–6 (N.D. Tex. July 23, 2013), at *5 (finding that any step two error was "harmless because the ALJ considered [the alleged] conditions in his RFC analysis").

### III. CONCLUSION

The Commissioner's decision is **AFFIRMED in part and REVERSED in part**, and the case is **REMANDED** to the Commissioner for further proceedings in order to determine the effects Plaintiff's shoulder impairment has on her ability to work at step five of the sequential process.

**SO ORDERED on this 21st day of March, 2016.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

37